**Bryan K. KENT, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

No. 98–4022–SAC.

United States District Court, D. Kansas.

Oct. 12, 1999.

Dan E. Turner, Philip L. Turner & Turner Law Firm, Topeka, KS, for Plaintiff.

Nancy Landis Caplinger, Office of U.S. Atty., Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant Bryan K. Kent's applications for disability insurance benefits under Title II of the Social Security Act ("Act") and for supplemental security income

("SSI") under Title XVI of the Act. The case is ripe for decision on the parties' briefs filed pursuant to D.Kan. Rule 83.7.

## PROCEDURAL HISTORY

The claimant applied for disability benefits under Title II on March 1, 1993, asserting he had been disabled as of February 2, 1992. He also applied on May 25, 1994, for SSI, asserting the same disability date. His claims were combined and denied initially and on reconsideration. At the claimant's request, a hearing before an administrative law judge ("ALJ") was held on January 8, 1996, and he appeared in person and with counsel. (Tr. 39–95). Witnesses at the hearing included the claimant and a vocational expert. The ALJ issued her decision on June 27, 1996, finding that the claimant was not disabled as defined under the Social Security Act. The appeals council denied the claimant's request for review after also considering a letter from the claimant's attorney and a psychological evaluation report dated August 22, 1996. Thus, the ALJ's decision stands as the Commissioner's final decision. *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir.1994) (citing *See* 20 C.F.R. § 404.981).

## STANDARD OF REVIEW

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the Commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). "A finding of 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Trimiar v. Sullivan*, 966 F.2d 1326, 1328 (10th Cir.1992) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir.1983)) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evi-

dence." *O'Dell v. Shalala*, 44 F.3d at 858 (citation omitted).

The court's review also extends to determining whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). Besides the lack of substantial evidence, reversal may be appropriate when the Commissioner uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.'"

*Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir.1985)). The court "must examine the record closely to determine whether substantial evidence supports" the Commissioner's determination. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996). The court is not to reweigh the evidence or substitute its judgment for the Commissioner's. *Glass v. Shalala*, 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services*, 961 F.2d 1495, 1498 (10th Cir.1992). Nonetheless, "'[f]indings as to credibility should be closely and affirmatively linked to substantial evidence....'" *Winfrey*, 92 F.3d at 1020 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir.1988)). The courts do not mechanically accept the Commissioner's findings. *Claassen v. Heckler*, 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services*, 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the" Commissioner. (citation omitted)).

Nor will the findings be affirmed by isolating facts and labeling them substantial evidence, as the court must scrutinize the entire record in determining whether the Commissioner's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). "'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the ... [Commissioner's] decision and, on that basis determine if the substantiality of the evidence test has been met.'" *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The claimant has the burden of proving a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar,* 966 F.2d at 1329. The burden then shifts to the Commissioner to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir.1989). The Commissioner satisfies this burden if substantial evidence supports it. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir.1993).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Commissioner determines the claimant is disabled or not. *Gossett,* 862 F.2d at 805. Step one is whether the claimant is currently engaged in substantial gainful activity. If not, the fact finder in step two decides whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 141, 107 S.Ct. 2287. Step three entails looking at whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, step four requires the claimant to show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity ("RFC") to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *See Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir.1988).

## ALJ'S FINDINGS

In her order of June 27, 1996, the ALJ made the following findings:

1. Claimant met the special earnings requirements of the Act on February 2, 1992, the date claimant stated he became unable to work, and continues to do so through the date of this decision.

2. Claimant has not engaged in substantial gainful activity at any time since February 2, 1992 and any work thereafter was an unsuccessful work attempt.

3. The medical evidence establishes that claimant has degenerative joint disease in the lumbosacral spine; and is status post closed head injury with residual organic brain syndrome and secondary depression with complaints of headaches and chronic muscle strain of undetermined etiology, but he does not have an impairment or combination of impairments listed in, or medically

equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. Claimant's testimony as to the severity of his impairments and attending symptoms is found to be no more than partially credible for reasons specifically set forth in the Rationale section of this decision.

5. Claimant has at all times retained a residual functional capacity for a range of light work where he is restricted to simple repetitive tasks and has poor or no spatial orientation and cannot change tasks while on the job.

6. Claimant is incapable of performing any of his past relevant work.

7. Claimant has ranged between 34 and 38 years of age which is defined as a "younger" individual.

8. Claimant has a high school education with additional vocational technical training in electronics, heating and cooling.

9. Based on an exertional capacity for a wide range of light or sedentary work, and claimant's age, education and work experience, section 404.1569 and the framework of Rules 202.21 and 201.28, Table Nos. 2 and 1, Appendix 2, Subpart P, Regulations No. 4 indicate that a conclusion of not disabled is appropriate.

10. Although claimant has some alleged nonexertional pain and some mental dysfunction, using the above cited Rules as a framework for decisionmaking, there are a significant number of jobs in the State of Kansas and the national economy which he can nonetheless perform, the numbers and identities of which were specifically set forth by the vocational expert at the time of claimant's hearing.

11. Claimant has not been under a "disability" as defined in the Social Security Act, as amended, at any time through the date of this decision.

(Tr. 17–18).

## SUMMARY OF ARGUMENTS

The claimant argues first that substantial evidence does not sustain the ALJ's determination that the claimant's testimony as to his "impairments and attending symptoms is . . . no more than partially credible." The claimant next contends that the medical records and testimony submitted do not sustain the ALJ's conclusions recorded on the Psychiatric Review Technique ("PRT"). Alternatively, the claimant asserts that the mental impairment as established by the record combined with his physical impairments prevent him from having a residual functional capacity to perform any substantial gainful work.

## FACTS

In January of 1991, the claimant, working as an electrician, was injured when a piece of fiberboard struck him on the back of his head driving his face forward into a piece of metal conduit. The force of the blow knocked him unconscious, cut open his chin, and knocked out some teeth. Related to this accident, the claimant suffered headaches, neckaches, and backaches. Despite these symptoms, he continued to work for one year with the substantial help of co-workers. During that year, the claimant fell twice on the job because of his impaired physical condition. In February of 1992, his headaches and his discomfort in his neck and back became so persistent and severe that he was unable to tolerate working.

On April 14, 1992, the claimant referred himself to Dr. Joseph Stein with complaints of "headache, neckache and low backache related to an injury." (Tr. 211). Dr. Stein observed complaints of pain during the cervical spine examination and "marked restriction of right lateral tilting with evidence of some left paralumbar muscle spasm" during lumbar examination. (Tr. 213). Dr. Stein recorded the impres-

sion that the claimant appeared as a "very honest and usually forthright man who works very hard and is reluctant to take off from work for injuries that he is able to tolerate." (Tr. 214). Finding in the examination no evidence of neurological damage or disorder, Dr. Stein referred the claimant to Midwest Occupational Health Services ("Midwest") for chronic neck muscle strain, chronic lumbar muscle strain and tension headaches.

On April 23, 1992, Dr. Dick Geis with the Midwest clinic examined the claimant. Observing chronic headaches and a "chronic back pain syndrome," Dr. Geis recommended x-rays of the back and a CT scan of the head, prescribed "a nonsterioidal anti-inflammatory drug/muscle relaxant," directed a trial of physical therapy, and opined that a "multi-disciplinary approach to his chronic pain may be necessary to return him to the work force which he seems very motivated to do." (Tr. 178). The x-rays revealed normal cervical and lumbar spines.

As ordered by Dr. Geis, the claimant was evaluated later in April for physical therapy at the Kansas Rehabilitation Hospital. The claimant's history showed that he had been receiving chiropractic treatments for his headaches and backaches until his insurance company discontinued payment for them and that he had been taking the medications of Parafon Forte and Dolobid[1] prescribed by Dr. Geis. The impression was that the claimant had "very non-functional movement" and that he "would benefit from further stretching and strengthening exercises for the cervical and lumbar spine as well as being placed into a pool therapy program." (Tr. 162). After seven treatment sessions, the claimant "showed very little functional progress as low back pain tended to increase and functional mobility showed no improvement." (Tr. 165). The claimant was discharged "with treatment goals not met." (Tr. 165).

On May 12, 1992, the claimant told Dr. Geis that his condition had not changed, that therapy had not helped, and that "[a]ny increased activity caused increased discomfort." (Tr. 181). Dr. Geis' impression was chronic back pain syndrome, and he noted that the prescribed medications would not be continued as they had not helped claimant. Dr. Geis opined "that only a chronic pain management program is likely to return this patient to the work force as regular therapy has not helped him nor has being off work for several months now." (Tr. 181). He also opined, however, that this pain management program was "probably premature" because the claimant was not yet "open to the idea that there was something unique about him which allows the pain to continue." (Tr. 181). Later in May, Dr. Geis received an MRI of the claimant's head and spine. There was "an abnormal area of increased signal intensity in the right cerebellar hemisphere" and some "[d]egenerative disc disease at L5–S1 with no disc herniation or stenosis observed." (Tr. 184–85). On May 26, 1992, Dr. Geis sought a neurological opinion from Dr. Stein about the "cerebellar abnormality" and about possible causes, other than chronic pain syndrome, for claimant's "considerable discomfort." (Tr. 187).

During July of 1992, the claimant's attorney referred him to Robert Barnett, a clinical psychologist, for an evaluation and testing. In his letter to the claimant's attorney, Barnett noted that the clinical scales indicated the claimant was "experiencing moderate depression due to his inability to solve his physical problems," and that the claimant had said he "would probably commit suicide" if the headaches worsened. (Tr. 169). Unable to conclude that the claimant's intellectual deficits

---

1. According to the Physician's Desk Reference (53rd ed.1999), parafon forte (p. 2239) is prescribed "for the relief of discomfort associated with acute, painful musculoskeletal conditions," specifically muscle spasms, and do-lobid (p. 1787) is a "nonsteroidal drug with analgesic, anti-inflammatory and antipyretic properties" prescribed for mild to moderate pain.

were caused by his accident, Barnett recommended a neuropsychological assessment by Dennis Swiercinsky. In September, Barnett wrote the claimant's counsel again with the results of two testing protocols and his summary that "Mr. Kent's personality testing shows him to be reacting strongly to his accident, and subsequent disability, through anxiety, depression, discouragement withdrawal, and general malaise." (Tr. 171). Barnett also noted that three clinical scales (Anxiety, Somatoform and Dysthymia) were elevated suggesting the presence or prominence of symptoms.

Dr. Stein's treatment notes show that he spoke with the claimant by telephone about the suicidal comment made to Barnett. Stein also examined the claimant on August 12, 1992. A notation for August 11, 1992, reflects that the claimant's attorney called Dr. Stein's office to confirm the claimant's appointment for August 12, 1992, as the claimant was "forgetful, disoriented, [and] confused" and to report that the court proceedings for August 11th were canceled because the claimant was "not feeling well" because of the "painful headaches." (Tr. 218). Dr. Stein referred the claimant to Clyde Rousey for his complaints of memory problems and to Dr. Geis for pain management.

Dr. Geis saw the claimant on September 9, 1992, and recorded the impression of chronic low back and neck pain syndrome with chronic headaches. The treatment notes conclude with the following:

> I spent a considerable amount of time explaining my impression to the patient, that being he I believe has chronic pain syndrom with pain out of proportion to objectively detectable disease. The patient questions the use of acupuncture. He is not a candidate for chronic pain management program at the Kansas Rehabilitation Hospital as he is not yet to the point where he is able to assume responsibility for contributing to or the management of his chronic pain syndrome. He will be rechecked here as needed as I have nothing further to offer to this gentleman.

(Tr. 189).

On September 15, 1992, Dr. Stein again saw the claimant after reviewing the examination report of Barnett. He told the claimant that there was evidence the claimant had "significant emotional features with his condition." (Tr. 220). Dr. Stein recommended a psychological evaluation to assess any recommendations for psychotherapy. Dr. Stein noted that the claimant "was quite resistant" to this course. (Tr. 220).

On September 8 and 10, 1992, Clyde Rousey ran a battery of psychological tests on the claimant "to provide detailed neuropsychological study of this man's memory and general neuropsychological status." (Tr. 191). The index scores were within the normal range indicating no memory problems other than those consistent with his intelligence level. There were no indications of significant neuropsychological deficits. There were positive findings on other tests that reflect a person's ability to be flexible in mental functioning. These findings were "consistent with the report that he has periods of becoming disoriented and confused and has occasional trouble in figuring out driving routes." (Tr. 193). Other test data indicated "trouble differentiating external from internal perceptions." (Tr. 193). Rousey reported that the testing showed the claimant to be "significantly depressed" and experiencing some social withdrawal and distortion of reality. (Tr. 193–94). Rousey further opined:

> [I]n reviewing the MMPI Profile which Dr. Barnett sent, with the approval of this gentleman, I note no indications of malingering or a factitious or conversion disorder. This conclusion is also corroborated by testing using the RAP. His work history as reported by himself and also in Dr. Stein's letter suggests his man has not been someone who tries to stay away from working or has engaged

in exploitation of the Workmens Compensation System.

(Tr. 194).

In his treatment notes dated September 29, 1992, Dr. Stein noted that Rousey's testing indicated "some relatively minor problems in spatial orientation and mental flexibility, but these do not appear to be suggestive of any serious cognitive difficulty at this time." (Tr. 221). On October 6, 1992, Dr. Stein saw the claimant who complained that his symptoms were the same and "that he had spent all day in bed on 10/3/92 because of headache." (Tr. 221). Dr. Stein recorded from the examination that the "[c]ervical spine shows limitation of range of extension no better than 50% and the same for bilateral tilting range. Rotation range is perhaps about 70% of normal and he complains of pain at the extreme of these ranges." (Tr. 221). Dr. Stein told the claimant that he "needs a comprehensive, coordinated program" that includes "a psychiatric evaluation to provide further analysis of how he is coping with his symptoms and further opinions about contributions from any psychogenic factors." (Tr. 221). On October 12, 1992, Dr. Stein referred the claimant to a physical therapist, Carolyn Bloom, for a therapy program that would be coordinated with a psychiatric program.

On November 10, 1992, claimant was referred by his attorney to Dennis Swiercinsky for a comprehensive neuropsychological assessment. Swiercinsky noted that the Derogatis Symptom Checklist results indicated "moderate elevation and amplification of symptoms" suggesting "somatization of psychological distress consistent with Dr. Barnett's psychological assessment." (Tr. 197). He observed that "all indices of abstract thinking and organizational reasoning suggest that ability to generalize information in the course of new learning is mildly compromised." (Tr. 201). As relevant to the proceedings here, Swiercinsky wrote:

> Subjectively, this individual is reacting to and experiencing neurofunctional changes with a great deal of anxiety and depression. The chronic pain and discomfort certainly adds to his distress and may contribute as much to perpetuating his cognitive compromise as actual brain damage might. He sees no relief in sight and is responding to his headache and neck pain with hypersensitivity such that his pain and disabling consequences are magnified. There is a circular process keeping him in pain because he is afraid to relax.
>
> **Vocational and Educational Implications**—The physical limitations are the obvious factors keeping this man from employment.
>
> Neuropsychological limitations are subtle enough that it is doubtful that they alone would prevent this man from returning to his former occupation.

(Tr. 201–02). Swiercinsky recommended a pain management program and psychological counseling.

Upon reading Swiercinsky's report, Dr. Stein recorded the following in his treatment notes:

> Somewhat similar to Dr. Rousey, there were findings of possible subtle brain damage, possibly related to the closed head injury, but with substantially good remaining functioning which is judged not to be sufficient to interfere with his usual functioning as an electrician. Superimposed upon this is great discouragement and limitation because of his persistent pain. Report recommends orthopedic assessment and referral to a pain treatment and pain management program, to try to break the pain cycle. We all know that this has already been attempted once and has failed. The other recommendation was for "brief psychological counseling to him (sic) his understand the dynamics of symptoms as analyzed by the neuropsychological assessment." It is my own opinion that much more than brief counseling is needed, and I would predict that a more extensive and sophisticated program of psychiatric evaluation and treatment will

be needed to help this man achieve rehabilitation.

(Tr. 223). As reflected in the treatment notes for December 4, 1992, Dr. Stein arranged for a psychiatric consultation with Douglas Sheafor and for coordinated physical therapy services with Bloom & Associates.

The physical therapy evaluation by Bloom showed a "quite limited" range of motion in the neck with pain on extension. Trunk rotation was also "markedly limited in side bending" with "sharp pains." (Tr. 229). The assessment was that the claimant "holds his trunk and neck quite rigid in a protective posturing" with decreased strength "especially in his neck and trunk muscle." (Tr. 232). A daily treatment plan for the first week was made consisting of different modalities. Three days into the treatments, claimant said his back was less tight but that his headaches were worse. Several days later, the claimant complained about having "one of the worst" headaches and had taken "a handful of tylenol." (Tr. 234). After a week of treatment beginning December 14, 1992, the claimant said he "was no better and maybe worse today." (Tr. 235). He told the therapist that he was apprehensive about his upcoming visit to the psychologist. On December 29, 1992, the claimant told the therapist that his headache was "worse today than it has been in a long time" and that "he hurts all over." (Tr. 236). The treatment notes for January 5, 1993, show that the claimant said he hurts "real bad" and that "everything hurts worse." The notes for the next day show that improvement varies daily and that "new activity creates new pain [and] discomfort, then [he] ... becomes apprehensive and discouraged." (Tr. 239). On January 8, 1993, a therapist with Bloom & Associates wrote Dr. Stein that the prescribed therapy sessions had been completed with various combinations of treatment but "all without significant relief" to claimant. (Tr. 240).

On December 23, 1992, Dr. Sheafor met with the claimant and prepared an initial consultation report that showed a provisional assessment of somatization disorder. (Tr. 205). After a second examination for a total two-hour evaluation time, Dr. Sheafor opined that the claimant showed "no signs of deep depression nor significant anxiety" but is "frustrated by this failure to improve and the inability to work has deprived him of a major source of satisfaction." (Tr. 207). He found:

nothing in the progression of events nor of his symptoms which suggested a primary psychiatric or emotionally caused problem. He has the posture of an individual who is suffering from chronic back pain but I saw nothing exaggerated or histrionic about his behavior. I could find no psychological motive or benefit to his physical symptoms. In summary, other than expectable (sic) secondary frustration with the chronic problem, I could not demonstrate a significant emotional contribution to Mr. Kent's problem.

(Tr. 207).

Dr. Stein's last examination of claimant occurred on January 13, 1993. His notes for that day reflect the following:

I told the patient that I would be communicating with Dr. Sheafor to get a formal report. Assuming that Dr. Sheafor could not find any significant emotional problem, I told the patient that I have no new ideas about trying to help him and feel that I cannot do anything further at this time.... I am very comfortable if the patient and his attorney want to consider getting another opinion from another professional individual. At the moment, the prognosis appears to be poor, with regard to improvement. The only thing that can be found on examination is limitation of movements of the neck, and patient appears to have a type of personality which cannot deal effectively with pain, which most other people would be managing in a much more productive manner.

I was able to (sic) Dr. Sheafor on the telephone this afternoon.... [H]e confirmed that he had not discovered any evidence of psychiatric disorder....

I then contacted his attorney, ... and told him I would be finishing my report and gave him the essence of the findings. I shared that it is very difficult for me to understand this man's behavioral pattern. I do not believe that he (sic) malingering, but I cannot understand why he has been unable to make any progress in rehabilitating himself after this lengthy period of disability. I cannot understand this in terms of any neurological abnormality and I think that there maybe some kind of a subconscious block in this man which creates an extensive system of psychological denial and a very strong tendency to remain entrapped by his condition.

(Tr. 226).

On March 3, 1993, Dr. Sankoorikal examined the claimant upon a referral by his attorney. The physical examination revealed "some tender trigger points ... in the temporalis muscle bilaterally" and "trigger points ... in the paraspinal area in the cervical paraspinal muscle." (Tr. 248). "The lumbar spine motion was normal except in lateral bending and rotation when he complained of some pain towards the end of range of motion." (Tr. 248). Dr. Sankoorikal's impression was that the claimant had the "signs and symptoms of chronic myofascial pain syndrome involving the trapezius, the small muscles of the neck, and the temporalis muscle which most likely could cause the headache and the neck and shoulder pain." (Tr. 248). He recommended a comprehensive therapeutic pain management approach that included physical therapy with modalities that addressed both the physical and the "psychosocial" components. "Patient, in my judgment, seems motivated to return to work and we should use all of our energy and resources to bring him back to that gainful employment status with his help." (Tr. 249).

In June of 1993, a Positron Emission Tomographic ("PET") imaging study of the claimant's brain was done. In a letter to claimant's attorney dated July 8, 1994, Dr. Gupta reviewed the PET scan results and correlated them with the psychological assessment report and other detailed history provided. He opined:

It appears that the functional metabolic deficits involving left temporal lobe and the left posterior occipital cortex as well as the left orbital frontal cortex could be related to the subtle deficit in the cognitive and integrative functioning as well as deficit in the visual motor coordination and angular discrimination reported in the psychological assessment report. Additionally some of these metabolic changes could explain the symptomatology of Mr. Kent following the head injury namely forgetfulness and visual difficulty.

(Tr. 255).

After last working in February of 1992, the claimant started back to work in June of 1994. He worked for two days and then went to the emergency room of a local hospital complaining of severe back pain. The emergency room physician observed some apparent guarding with movement and tenderness diffusely along the paraspinal muscles. The physician prescribed anaprox[2] for the pain, advised the claimant to be off work, and referred him to an orthopedic surgeon on call. The claimant did not return to work and made no further efforts to do so.

---

**2.** According to the Physician's Desk Reference (53rd ed.1999), anaprox is "a nonsteroidal anti-inflammatory drug with analgesic and antipyretic properties" (p. 2673) that is "recommended for the management of acute painful conditions when prompt onset of pain relief is desired" (p. 2673).

In July of 1994, Linda Dunn, Ph. D., performed a disability consultative examination of the claimant. Dunn observed that the claimant "walked with a slight limp and appeared physically uncomfortable." (Tr. 261). "His mood seemed quite depressed. However, he said that he was mostly damned angry about his health care." (Tr. 262). "Although his thinking was generally logical, he did appear forgetful and lost his train of thought at times. At one point I asked him a question and within a few seconds he had forgotten the question and what he had been talking about." (Tr. 262). Dunn's diagnostic impression was severe depression without psychotic features.

Also in July of 1994, Dr. Chamberlin performed a consultative examination of the claimant. He noted that the claimant was "dramatic" and "winces and withdraws with pain." (Tr. 267). He observed pain in the cervical spine and lumbar spine. His conclusion was lumbar arthralgias with restricted range of motion but without paraspinus muscle spasm. The claimant had moderate difficulty squatting and hopping but had no difficulty getting on or off the examining table and with heel and toe walking.

In September of 1994, Rousey examined the claimant again to compare the claimant's current neuropsychological status with that determined by Rousey two years earlier. Rousey reported that during the testing the claimant complained of "repeated periods of numbing of his feet and legs and of [p]roblems with vision ... whenever he had to concentrate for any period of time reading print." (Tr. 321). Because of some positive findings of cognitive deterioration and the involvement of litigation, Rousey administered additional tests to determine the potential for malingering. Rousey found no patterns consistent with someone malingering or faking emotional distress. Rousey observed:

He does however, demonstrate continued emotional distress consistent with what Dr. Barnett had reported in 1992. He exhibits concerns consistent with someone who is severely depressed, has many somatic complaints, has disturbances in relationships with others, feelings of being mistreated and suspiciousness and withdrawal from interactions with others. While the above problems represent dysfunctional states, they are clinically consistent with some with cognitive and physical problems related to organic conditions which may have been further stressed as function of the length of the litigation process.

The issue of depression was further studied by use of the Inventory to Diagnose Depression. His results are consistent with the diagnosis of a moderate to severe Major Depression. Further, on the Beck Hoplessness Scale he indicates a significant level of hopelessness statistically consistent with the potential for suicide.

(Tr. 323). Rousey concluded:

Given this man's current presenting complaints of blurred vision, continued headaches, numbing sensations in his extremities and consistent feelings of head and ear congestion, one would wonder if any additional medical problems could now be identified. He certainly had competent evaluations of these complaints in the past, but the fact that his physical complaints continue to persist with no evidence on psychological tests of their being a function of neurotic or functional factors raises the question of whether there would now be any thing which be done to help him.

(Tr. 324).

On August 10, 1996, Barnett psychologically evaluated the claimant to assess his mental and emotional limitations to employment. He opined that the claimant "is not capable of gainful employment, of any type, due to his combination of physical, cognitive, and emotional limitations."

(Tr. 420).

## ANALYSIS

The ALJ determined here that the plaintiff could not return to his past relevant work as an electrician, but that he still could perform the jobs identified by the vocational expert. Once the claimant establishes his incapacity to perform his past work before his insured status expired, it becomes the Commissioner's burden to show that the claimant retained the RFC to do other work that exists in the national economy. *Thompson,* 987 F.2d at 1487. The ALJ found the plaintiff's medically determinable impairments to be as follows: "degenerative joint disease in the lumbosacral spine; and is status post closed head injury with residual organic brain syndrome and secondary depression with complaints of headaches and chronic muscle strain of undetermined etiology." (Tr. 17). As for the plaintiff's RFC, the ALJ found that the plaintiff "has at all times retained a residual functional capacity for a range of light work where he is restricted to simple repetitive tasks and has poor or no spatial orientation and cannot change tasks while on the job." (Tr. 17). The issues on appeal are directed at whether these findings of impairment and RFC are supported by substantial evidence. The overriding issue is whether the ALJ's finding as to claimant's credibility is supported by substantial evidence

"Generally, credibility determinations are the province of the ALJ, 'the individual optimally positioned to observe and assess witness credibility.'" *Adams v. Chater,* 93 F.3d 712, 715 (10th Cir.1996) (quoting *Casias v. Secretary of Health & Human Servs.,* 933 F.2d at 801). Consequently, a "court ordinarily defers to the ALJ as trier of fact on credibility, ... [but] deference is not an absolute rule." *Thompson v. Sullivan,* 987 F.2d at 1490 (citations omitted). It is "recognize[d] that some claimants exaggerate symptoms for purposes of obtaining government benefits, and deference to the fact-finder's assessment of credibility is the general rule." *Frey v. Bowen,* 816 F.2d 508, 517 (10th Cir.1987). Thus, a court "will not upset such [credibility] determinations when supported by substantial evidence." *Bean v. Chater,* 77 F.3d 1210, 1213 (10th Cir.1995) (internal quotation omitted).

In evaluating claimant's testimony regarding impairments and symptoms, the ALJ noted that the claimant testified to "a little bit of everything with every type of pain which changes and is not always in the same location," but admitted he had not seen any doctors recently. (Tr. 13). As for the headaches, the ALJ wrote that the claimant "was taking no prescriptive pain medication whatsoever" and was relying only on aspirin, Tylenol or Ibuprofen. (Tr. 13). The ALJ found that the claimant described his daily activities "as being somewhat limited" but admitted to doing "quite a bit of housework" on a good day. (Tr. 13).

In support of her finding that the "claimant's testimony as to the severity of his impairments and attending symptoms ... [was] no more than partially credible," (Tr. 17), the ALJ gave the following specific reasons: (1) because he was receiving workers' compensation temporary total disability payments, the claimant "may not have had a financial incentive to return to work;" (2) "no treating or examining physician of record has" opined that the claimant is disabled; (3) "a global assessment of functioning shows that depression is not significantly disabling," and has not been diagnosed as expected to last for twelve months, and the claimant has not received treatment or been prescribed medications for the depression; (4) "the treating physicians have opined that these [cerebellum] abnormalities are not totally disabling;" (5) despite "allegations of overwhelming pain in multiple anatomical areas," the claimant "is not taking any prescriptive pain medications," (6) no adverse side effects from

the pain medications used are alleged or shown in the record; (7) the claimant's range of activities, including his housework and walking on his father's work, is inconsistent with total disability; (8) the claimant's description of his pain as "ambient and moving in nature and not in the same location all the time" is not "substantiated by outpatient treatment records, clinical findings or any opinion from any physician of record;" (9) "one of claimant's treating physicians has indicated that claimant can work despite his pathology (Exhibit 28)." (Tr. 14–15).

■ " 'To establish disabling pain without explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony of pain evaluated by the ALJ and weighed alongside the medical evidence. An ALJ may not ignore the evidence and make no findings.' " *Kepler v. Chater,* 68 F.3d 387, 390 (10th Cir.1995) (quoting *Huston v. Bowen,* 838 F.2d at 1131 (citations omitted)). Where there is evidence of allegedly disabling pain, courts in the Tenth Circuit look to *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987), for the framework of proper analysis:

> "We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling."

*Kepler v. Chater,* 68 F.3d at 390 (quoting *Glass v. Shalala,* 43 F.3d at 1395). If objective medical evidence shows a pain-producing impairment, the ALJ then must consider the claimant's allegations of severe pain and decide whether she believes them. *Thompson v. Sullivan,* 987 F.2d at 1489. Some of the factors to be considered at this point include:

> "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony and objective medical evidence."

*Kepler,* 68 F.3d at 391 (quoting *Thompson,* 987 F.2d at 1489).

■ The ALJ must link his credibility finding to substantial evidence, that is, the ALJ needs to "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." *Kepler,* 68 F.3d at 391. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d at 1133 (footnote omitted). The "ALJ 'must articulate specific reasons for questioning the claimant's credibility' where subjective pain testimony is critical." *Kepler,* 68 F.3d at 391 (quoting *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir.1992)).

■ The ALJ's written decision cites the different factors outlined in *Luna* and discusses many of them in evaluating the credibility of the claimant's testimony on pain, symptoms and RFC.[3] The ALJ first commented that the claimant's receipt of

---

**3.** Noticeably absent from the decision are the findings regarding "(1) whether the Claimant established a pain-producing impairment by objective medical evidence; and (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain." *Kepler,* 68 F.3d at 390. The ALJ bypassed the first two steps and focused exclusively on "whether considering all the evidence, both objective and sub-

workers' compensation benefits may have been a disincentive for returning to work. Though the record supports the fact that the claimant was receiving those benefits, the only evidence of record regarding the defendant's motive in this regards contradicts, rather than supports, the ALJ's stated inference. The claimant's treating physician, Dr. Stein, observed that the claimant appeared to be someone who "works very hard and is reluctant to take off work." (Tr. 214). Another treating physician, Dr. Geis, recorded that the claimant "seems very motivated" about returning to work. (Tr. 178). Other physicians observed that the claimant appeared "motivated to return to work" (Tr. 249), that the psychological testing showed no indications of malingering, (Tr. 194), that the claimant's work history was not consistent with "someone who tries to stay away from working" or exploits the workers' compensation system (Tr. 194), and that the claimant was "frustrated by this failure to improve and the inability to work has deprived him of a major source of satisfaction" (Tr. 207). As reflected in the claimant's testimony, he continued to work for almost a year after the accident until the pain prevented him and only then did he seek workers' compensation benefits. While he was receiving these benefits, the claimant made a painful attempt to return to work. The evidence of record overwhelmingly contradicts the ALJ's inference that the plaintiff was not motivated to return to work. Moreover, this uncontroverted evidence is significantly probative in evaluating the claimant's credibility, and the ALJ never mentioned it nor offered any reason for rejecting it.

The claimant next takes issue with the ALJ's comments that despite multiple complaints of pain the claimant was "not taking any prescriptive pain medications" and that the claimant did not seek or receive medical treatment consistent with

the level of his alleged symptoms and complaints. (Tr. 15). The claimant did testify at the hearing that he was not presently taking any prescribed medications for the pain. The uncontradicted evidence of record shows, however, that he had been prescribed pain medications on more than one occasion and that he did not ask for refills as the medications had not helped him significantly. (Tr. 161, 181, 259). Indeed, Dr. Geis commented that he saw "no point in continuing" the medications. (Tr. 181). Rather than concluding from this fact that the claimant's pain was not serious, Dr. Geis opined that a chronic pain management program was probably the best course as therapy and rest had not helped the claimant. (Tr. 181). In October of 1992, the treating physician, Dr. Stein, tried this approach and prescribed a program of physical therapy that would be coordinated with a psychiatric treatment. (Tr. 222). This program also failed as the claimant never improved significantly from the physical therapy and the evaluation conducted by the psychiatrist Dr. Sheafor revealed no "primary psychiatric or emotionally caused problem." (Tr. 207). In November of 1993, Dr. Stein discontinued his efforts to diagnose and treat claimant stating the prognosis for improvement "appears to be poor." (Tr. 225). Indeed, Dr. Stein said he did not believe the claimant was malingering, candidly admitted he could not understand the claimant's lack of improvement in terms of any neurological abnormality, and opined "that there maybe some kind of a subconscious block in this man which creates an extensive system of psychological denial and a very strong tendency to remain entrapped by this condition." (Tr. 226). Finally, the claimant testified that he took "handfuls" of over-the-counter pain medication and restricted his activities to handle the pain. The record does not contain substantial evidence to support the ALJ's stated inference that the claimant did not seek or obtain medical

jective, Claimant's pain is in fact disabling." *Id.*

care and treatment consistent with his allegations of severe and chronic pain.

■ The claimant next disputes the ALJ's conclusory statement that the claimant "continues to engage in a range of activities which is inconsistent with disability and his testimony about his level of housework and walking on the farm with his father is inconsistent with total disability." (Tr. 15). A claimant "need not prove that her pain precludes all productive activity and confines her to life in front of the television." *Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir.1996) (citation omitted). Evidence that a claimant engages in limited activities may be considered, along with other relevant evidence, in considering entitlement to benefits. *Gay v. Sullivan*, 986 F.2d 1336, 1339 (10th Cir.1993); *Gossett v. Bowen*, 862 F.2d at 807. Statements regarding daily activities are evidence properly considered under the Commissioner's regulations. See 20 C.F.R. §§ 404.1529(a); 416.929(a). In short, the ALJ should consider whether the plaintiff's daily activities are substantially consistent with the kind and extent of disability claimed. The court cannot find in the claimant's testimony a level of housework that is inconsistent with his stated disability. If anything, the claimant testified that some recent housework had aggravated his back pain. (Tr. 428–29). The claimant described his house as "not very well kept," and that the housework was not done when he was "having a lot of trouble with" his back. (Tr. 443). As for occasional slow walks on a farm, the record does not establish that this is inconsistent with the claimant's testimony about his level of activities when he is having a better day. " 'Occasional symptom-free periods—and even the sporadic ability to work are not inconsistent with disability.' " *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir.1998) (quoting *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir.1995)).

The claimant takes issue with the ALJ's finding that the claimant's "vague complaint of pain in multiple anatomical areas" are not substantiated by treatment records, clinical findings or a physician's opinion.[4] (Tr. 15). The record shows otherwise. The progress notes from the Kansas Rehabilitation Hospital reflect complaints of pain in ears, upper back, neck and lower back. (Tr. 161). In April of 1992, the claimant told Dr. Geis about "discomfort in his right thumb," "headache, neck, midback and lower back discomfort." (Tr. 176). He described "a whole head bitemporal, pounding, stabbing, pressure sensation which is increased with any activity." He "complains of pressure around both ears." (Tr. 177). "His low back pain midlumbar and radiating off to both sides. He has alternate discomfort diffusely in both legs." (Tr. 177). On May 5, 1992, the claimant told the therapist that the "pain seems to be spreading." (Tr. 164). On December 29, 1992, the claimant told another therapist the "he hurts all over." (Tr. 236). In March of 1993, the claimant described pain in neck and shoulder area and said his lower back pain occasionally "radiates to the right knee and sometimes

---

4. The ALJ followed this sentence with the following: "On the contrary, one of claimant's treating physicians has indicated that claimant can work despite his pathology (Exhibit 28)." Tr. 15. Exhibit 28 is the written report of the psychologist Dennis Swiercinsky who apparently examined the claimant solely for purposes of making a neuropsychological assessment. The exhibit does not suggest any "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502 (Definition of a "treating source"). As far as making an impairment rating, Swiercinsky "focused only on brain dysfunction." (Tr. 202). He further noted that the claimant's "physical limitations are the obvious factors keeping this man from employment" and that the claimant "is responding to his headache and neck pain with hypersensitivity such that his pain and disabling consequences are magnified." (Tr. 201–02). The record lacks substantial evidence in support of the broad statement found in the ALJ's decision.

up to the toes." (Tr. 246–47). "[H]e complains of some numbness in the anterior aspect of the right thigh." (Tr. 247). In September of 1994, the claimant complained to Rousey of "repeated periods of numbing of his feet and legs" and of "[p]roblems with vision ... whenever he had to concentrate for any period of time reading print." (Tr. 321). The record is replete with references of physicians observing limitations in range of motion and pain in one or more of these regions.

■ The claimant's last challenge goes to this finding by the ALJ: "Insofar as the physical evidence is concerned, the undersigned is unable to reasonably conclude that claimant has any physical problem which prohibits substantial gainful work activity." (Tr. 15). The claimant points to the different medical findings that the claimant suffered from chronic pain syndrome in his neck and back. The ALJ never discusses in her order the different medical findings of chronic pain syndrome, even though the two treating physicians, Dr. Geis and Dr. Stein, and other consulting physicians essentially concurred on this medical finding. "Somatic contributions to pain may be disabling in themselves." *Smith v. Apfel,* 141 F.3d 1185, 1998 WL 105935, at *3 (10th Cir. Mar.11, 1998) (Table) (citing *Easter v. Bowen,* 867 F.2d 1128, 1129–30 (8th Cir.1989)). There are numerous references in the medical record to the plaintiff being hypersensitive or dramatic or exaggerating pain symptoms, all of which support a diagnosis of pain syndrome or a related somatoform disorder. *See Cox v. Apfel,* 160 F.3d 1203, 1208 (8th Cir.1998) ("consistent diagnosis of chronic pain syndrome can serve as an objective basis for pain") (citing *Bakalarski v. Apfel,* No. 97–1107, 1997 WL 748653 (10th Cir.1997)); *Phillips v. Shalala,* 25 F.3d 1058, 1994 WL 161332, at *5 (10th Cir. May 2, 1994) (Table). The ALJ is required to consider whether psychological issues combined with the physical problems to produce a disabling pain. *See Luna,* 834 F.2d at 166; *see, e.g., Latham v. Shalala,* 36 F.3d 482, 484 (5th Cir.1994). On remand, the ALJ must discuss these significant diagnoses of chronic pain syndrome diagnoses, and consideration should be given them in completing the Psychiatric Review Technique.

■ A credibility assessment necessarily requires consideration of all the factors "in combination." *Huston,* 838 F.2d at 1132 n. 7. Thus, when the ALJ has relied on several factors which are found to be unsupported or contradicted by the record, the court "is precluded from weighing the remaining factors to determine whether they, in themselves, are sufficient to support the credibility determination." *Bakalarski v. Apfel,* 131 F.3d 151, 1997 WL 748653, at *3 (10th Cir. Dec.3, 1997) (Table). Because the medical evidence concerning the severity of claimant's impairment was not overwhelming in either direction, the ALJ's credibility determination became all the more important. The different points either unsupported or contradicted by the record undermine the ALJ's credibility finding and, thus, undermine the ultimate determination that the claimant could perform a range of light work and was not disabled. The court must remand the case to the Commissioner for further proceedings consistent with this order. Of course, the court is not directing a particular result nor implying that the claimant's complaints are necessarily credible. The court, however, is requiring that all such findings be supported by substantial evidence.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is reversed and remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order.