Paula WINDUS, Plaintiff,

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

No. 04–C–0499.

United States District Court,
E.D. Wisconsin.

Nov. 15, 2004.

David G. Dreis, Milwaukee, WI, for Plaintiff.

Nora S. Barry, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Paula Windus seeks judicial review of the denial of her application for social security disability benefits. 42 U.S.C. § 405(g). Plaintiff alleged that she was unable to work due to liver disease, depression and anxiety, but her claim was rejected by an Administrative Law Judge ("ALJ") following a hearing. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Social Security Administration for purposes of judicial review. *See Flener v. Barnhart*, 361 F.3d 442, 446 (7th Cir.2004).

Plaintiff argues that the ALJ's decision must be reversed because (1) the ALJ improperly evaluated the opinions of her treating physicians and ignored the opinions of several consulting physicians; and (2) the ALJ erred in evaluating her credibility. She asks that the matter be remanded for an award of benefits or, in the alternative, for reconsideration by a different ALJ. The Commissioner responds that the ALJ's decision was supported by substantial evidence and legally sound. The matter has been fully briefed and is ready for decision.

## I. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

In order to obtain disability benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Administration has adopted a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4). Under this test, the ALJ must determine:

(1) Whether the claimant is currently engaged in substantial gainful activity ("SGA");

(2) If not, whether the claimant has a severe impairment; [1]

(3) If so, whether the claimant's impairment(s) meets or equals one of the impairments listed in the Administration's regulations as being so severe as to preclude SGA; [2]

(4) If not, whether the claimant can perform her past relevant work;

(5) If not, whether the claimant can make the adjustment to other work.

*Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir.2004).

If the claimant makes the necessary showing at steps 1–3, she will be found disabled. If her impairment is not of such severity as to be presumptively disabling, the ALJ must consider whether the claimant possesses the residual functional capacity ("RFC") to perform her past work. *Lechner v. Barnhart*, 321 F.Supp.2d 1015, 1018 (E.D.Wis.2004). If not, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *Young*, 362 F.3d at 1000. The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of

---

**1.** An impairment is severe if it significantly limits the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 1521(a).

**2.** These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. *Worzalla v. Barnhart,* 311 F.Supp.2d 782, 787 (E.D.Wis. 2004).

Disability claims based on mental disorders are evaluated in essentially the same manner as claims based on physical impairments. If the mental impairment is severe, the ALJ must determine whether it meets or equals any of the Listings. *Wates v. Barnhart,* 274 F.Supp.2d 1024, 1036 (E.D.Wis.2003). The Listings of mental impairments consist of three sets of "criteria"—the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA. *Lechner,* 321 F.Supp.2d at 1018. There are four broad areas in which the ALJ rates the degree of functional limitation: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). If the claimant satisfies the A and B, or A and C criteria, she will be considered disabled.

*Wates,* 274 F.Supp.2d at 1036 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00).

As with physical impairments, if the claimant's mental impairment does not meet or equal a Listing, the ALJ must evaluate the claimant's mental RFC. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00; 20 C.F.R. § 404.1520a(c)(3). The RFC assessment "complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Under SSR 85–16, Residual Functional Capacity For Mental Impairments, "this evaluation includes consideration of the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting." *See also* POMS DI 25020.010B.3 (stating that the mental ability to perform unskilled work includes the ability to remember work-like procedures, understand and remember instructions, maintain attention, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, make simple work-related decisions, complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and be aware of normal hazards and take appropriate precautions).

## B. Review of ALJ's Decision

Under § 405(g), the district court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir.2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997). The ALJ commits such an error if he fails to comply with the Commissioner's Regulations and Rulings. *Brown v. Barnhart*, 298 F.Supp.2d 773, 779 (E.D.Wis.2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991)).

The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir.2001). Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge from the evidence to the result. *Hodes v. Apfel*, 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (1996)).

Finally, ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Ro-*

*han*, 98 F.3d at 970. "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990).

## II. FACTS AND BACKGROUND

Plaintiff was 42 years old at the time of her hearing, with previous work experience as a bartender and waitress. She dropped out of school in the 11th grade and had not obtained a GED, though she was able to read and write. She lived with her boyfriend, Chuck Johnson, and her cat. (Tr. at 359–60.)

Plaintiff alleged disability due to liver disease secondary to a long history of alcohol abuse, depression and anxiety. The medical evidence before the ALJ pertaining to those conditions was as follows.

### A. Medical Evidence

#### 1. Treating Sources

#### a. Physical Impairments

On August 17, 2000, plaintiff was admitted to Froedert Memorial Hospital complaining of abdominal pain, jaundice, nausea, diarrhea and blurred vision. A CT scan of her abdomen revealed a markedly enlarged and nodular liver, consistent with acute hepatitis and early cirrhosis. Ascites (accumulation of fluid)[3] was present in the abdomen. Plaintiff told the doctor that she drank four to five beers per day with frequent binges. (Tr. at 112.) Plaintiff was diagnosed with end stage liver disease with acute hepatitis secondary to hepatitis C and alcoholism. (Tr. at 115.) On August 22, she was discharged on a low sodium diet with no activity restrictions and various medications, and advised to follow up in the general internal medicine

---

**3.** *Stedman's Medical Dictionary* 154 (27th ed.2000).

clinic. (Tr. at 115.) Plaintiff was seen by Dr. Kashif in follow up on August 29, September 12 and October 2. She reported that she had stopped drinking, and her medication was continued. (Tr. at 138–49, 313–14.)

Plaintiff then began receiving treatment for her liver disease from Dr. Affi at Digestive Disease Specialists of Wisconsin. On April 6, 2001, Dr. Affi wrote that plaintiff continued to consume alcohol, with her last consumption being March 24,[4] but that her alcohol use had slowed since August 2000. She reported no abdominal pain, but did complain of nausea without vomiting. She was continuing to take diuretics, vitamins and folic acid. On examination, plaintiff's abdomen was soft, with mild tenderness in the right upper quadrant. The liver was hardly palpable and there was no evidence of ascites. (Tr. at 169.) Dr. Affi's impression was that plaintiff had alcoholic liver disease, hepatitis C and end stage liver disease. His plan was to obtain additional tests, then address further treatment, including hepatitis C treatment and possible referral to the liver transplant clinic. However, this was to be addressed after plaintiff quit drinking, three months of abstinence for the hepatitis C treatment and six months for the liver transplant referral. (Tr. at 170.)

Plaintiff returned on April 25, and Dr. Affi reviewed the recent tests. His impression was that plaintiff had hepatitis C, but it was unclear whether she had cirrhosis. He decided to obtain a liver biopsy, then proceed with hepatitis C treatment with interferon and ribavirin. (Tr. at 166–68.) Sometime in May, plaintiff called Dr. Affi, stating that she was coughing up blood. Dr. Affi believed the problem was bronchial in origin and advised her to call her primary doctor. (Tr. at 166, 298.)

On June 4, Dr. Affi performed the biopsy, which revealed chronic hepatitis C with moderate portal infiltration and moderate piecemeal necrosis,[5] grade 3, with cirrhotic changes. (Tr. at 185–88; 299, 303–05.) On June 22, plaintiff returned to Dr. Affi, who reviewed the results of the biopsy and advised her that she needed to be treated for hepatitis C. Plaintiff was to begin when Pegylated interferon was available. (Tr. at 297.) In July 2001, Dr. Affi prescribed a one month supply of interferon and ribavirin. (Tr. at 295.)

However, plaintiff's insurance refused to cover the treatment (Tr. at 293), and plaintiff did not see Dr. Affi for several months; a November 26, 2001 note indicates that plaintiff and the doctor made several attempts to speak by phone, unsuccessfully. (Tr. at 296.) Plaintiff finally returned to Dr. Affi on December 6, 2001, complaining of occasional nausea and some right upper quadrant pain. She denied any swelling of her abdomen or ankles. Plaintiff's physical examination was remarkable for evidence of chronic liver disease including spider angiomas.[6] However, there was no evidence of jaundice or ascites, no masses, and only mild tenderness in the right upper quadrant. (Tr. at 293.) Dr. Affi's impression was that plaintiff had advanced liver disease with some elements of cirrhosis and a history of hepatitis C. Dr. Affi ordered repeat lab tests, as it had been more than six months since her last set of

---

4. At the hearing, plaintiff testified that she had consumed a non-alcoholic beer on her birthday, March 24. (Tr. at 368.)

5. Necrosis is the "death of . . . a portion of tissue or organ, resulting from irreversible damage." *Stedman's Medical Dictionary* 11885 (27th ed.2000).

6. Spider angiomas are arterioles in the skin with radiating capillary branches simulating the legs of a spider, characteristic of liver disease. *Stedman's Medical Dictionary* 83 (27th ed.2000).

tests. He was to see her in follow up when she was approved for therapy for hepatitis C. (Tr. at 293.) It appears that such approval never came.

On June 28, 2002, plaintiff was seen by Josh Knox, PA, at the Froedert Gastroenterology/Hepatology Clinic. However, aside from detailing diagnoses of hepatitis, anxiety disorder and depression, and suggesting several tests, the note is difficult to decipher. (Tr. at 311–12.)

On July 3, 2002, Dr. Saeian and Mr. Knox completed a hepatitis medical assessment form, stating that plaintiff exhibited general malaise, difficulty concentrating, chronic fatigue, diarrhea, cirrhosis and associated psychological problems due to her hepatitis, which would frequently interfere with attention and concentration. (Tr. at 287–88.) They stated that plaintiff was unable to perform or could not be exposed to detailed tasks, strict deadlines, close interaction with co-workers or supervisors, fast paced tasks and work hazards. (Tr. at 288.) They opined that plaintiff could walk two blocks, continuously sit more than two hours, stand for 30 minutes, stand/walk less than two hours in an eight hour day, sit at least six hours in an eight hour day, lift 10 pounds frequently and 20 pounds occasionally, and occasionally twist or stoop. They stated that plaintiff would require more than 10 unscheduled breaks during a work day due to pain and anxiety. (Tr. at 289–90.) They concluded that the bulk of plaintiff's problems were related to depression and anxiety, that her cirrhosis was well-compensated, and that it was unlikely that she could tolerate anti-viral therapy for her hepatitis. (Tr. at 291.)

## b. Mental Impairments

In May 2001, plaintiff began receiving mental health treatment at Sinai—Aurora Behavioral Health Services. At her initial evaluation on May 22, plaintiff reported feeling anxious and depressed. She stated that she quit drinking after August 2000, and since that time felt extremely anxious, with poor sleep. (Tr. at 190.) She reported that she would like to work but required light duty jobs due to her medical problems. (Tr. at 192.) She described her symptoms as crying, hopelessness, disturbed sleep, social withdrawal, anxiety and panic attacks. (Tr. at 193.) She stated that she had experienced some anxiety in the past but was never treated and believed it was likely masked by alcohol use. (Tr. at 193.) She described a history of serious alcohol abuse, drinking a case to a case and a half of beer per day, starting in the morning. She also mentioned cocaine abuse in the distant past. (Tr. at 194.) She was oriented to person, place and time, had normal affect, good insight, good judgment, fair recent memory, fair remote memory, fair concentration, fair attention, and an average fund of knowledge. (Tr. at 196.) The diagnosis was panic disorder, and her Global Assessment of Functioning (GAF) was 52.[7] (Tr. at 197.)

Plaintiff began seeing Dr. Chrostowski, a psychologist, for therapy on May 29, 2001, and reported continued anxiety but with no panic attacks in the previous two weeks. The panic attacks appeared to be related in part to her health status. However, she also experienced attacks "out of the blue." She reported ongoing concentration and memory problems, and was noted to repeat herself and lose her train of thought during the session. She re-

---

**7.** GAF is an assessment of the person's overall level of functioning. Set up on a 0–100 scale, a score of 50–60 denotes "moderate symptoms," i.e. "moderate difficulty in social, oc-

cupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders* (*"DSM–IV"*) 32–34 (4th ed. 2000).

mained abstinent and was provided with information on a relapse prevention group. (Tr. at 189.)

Plaintiff returned to Dr. Chrostowski on June 12, reporting continued anxiety and poor sleep. She remained abstinent. (Tr. at 189.) On June 26, plaintiff reported increased panic after receipt of the results of her liver biopsy and her doctor's statement that she had "two to three years" to live. (Tr. at 184.) Plaintiff was advised to practice breathing techniques to deal with her panic attacks, and was scheduled to begin relapse prevention on June 27, to see a psychiatrist on June 28 and return to Dr. Chrostowski on July 10. Her diagnoses were panic disorder-agoraphobia, major depression and a history of substance abuse, with a GAF of 50. (Tr. at 183–84.)

On June 28, plaintiff was seen by Dr. Peter Stein, a psychiatrist, at Sinai Samaritan. Dr. Stein found plaintiff alert, interactive and socially appropriate, but her mood was depressed and her affect sad and concerned. Her recent and remote memory were essentially intact. Dr. Stein's diagnoses were panic disorder with agoraphobia, alcohol dependence syndrome, history of poly-substance abuse, and major depressive disorder, with a GAF of 50. (Tr. at 307.)

On July 10, plaintiff returned to Dr. Chrostowski, reporting on-going stress and panic attacks, as well as some agoraphobic symptoms. (Tr. at 331.) On July 17, she told Dr. Chrostowski she felt better and that she had a job interview that week. (Tr. at 331.) On August 27, November 23, 2001, January 24 and April 18, 2002, plaintiff saw Dr. Burgarino, a psychiatrist, who prescribed medication. (Tr. at 329–30.) On November 23, 2001, Dr. Burgarino prepared a letter stating: "This is

to certify that Ms. Paula Windus is severely ill and is totally and permanently disabled." (Tr. at 277.)

On April 18, 2002, Dr. Burgarino completed a check box form in which he identified plaintiff's diagnoses as major depression, with a GAF of 30.[8] He opined that her attention and concentration would frequently be interfered with due to her symptoms. (Tr. at 279.) He further stated that plaintiff could not perform or be exposed to public contact, routine tasks at a consistent pace, detailed tasks, strict deadlines, close interaction with co-workers or supervisors, fast paced tasks and work hazards. (Tr. at 280.) He opined that she would need more than 10 unscheduled breaks during the work day due to panic attacks, and would be absent more than four days per month due to her impairment. (Tr. at 280.) Regarding the B criteria of the mental impairment Listings, Dr. Burgarino concluded that plaintiff had "extreme" restriction of activities of daily living, social functioning, and concentration, persistence and pace; and four or more episodes of decompensation. (Tr. at 282.) Finally, he concluded that plaintiff was unable to meet competitive standards regarding all of the mental abilities and aptitudes needed to work listed on the mental RFC form. (Tr. at 284.)

On April 23, 2002, plaintiff had another therapy session with Dr. Chrostowski. She reported continued panic attacks and agoraphobia. Plaintiff cancelled her May 9 appointment due to illness. On May 29, she reported sleep disruption but stated that she had been getting out more and did not experience any panic attacks. (Tr. at 328.) On June 10, plaintiff cancelled her appointment with Dr. Chrostowski due to illness but stated she was "feeling bet-

---

8. A GAF of 30 denotes serious impairment in communication or judgment, or inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends). *DSM–IV* at 34.

ter." (Tr. at 327.) On June 27, she again failed to appear. On July 17, she called Dr. Chrostowski, tearful and anxious. She agreed to appear the following day, and at that time seemed more stable but still anxious. (Tr. at 327.)

On July 16, 2002, Dr. Chrostowski completed a check box form in which he agreed with Dr. Burgarino's April 18, 2002 report. (Tr. at 286.)

## 2. Consulting Sources

Plaintiff's impairments were also evaluated by several consultants for the Administration.

### a. Mental Impairments

On March 15, 2001, Jean Warrior, Ph.D. completed a Psychiatric Review Technique form for the Administration, following of a review of medical records. (Tr. at 150.) She evaluated plaintiff under Listing 12.09, Substance Addiction Disorders (Tr. at 150, 158), concluding that plaintiff had mild restriction of activities of daily living; mild difficulty in maintaining social functioning; mild difficulty in maintaining concentration, persistence or pace; and no episodes of decompensation (Tr. at 160). Dr. Warrior wrote:

> The claimant was hosp[italized] 8/17–22/00 with end stage lever disease [secondary] to alcohol abuse. The claimant has totally stopped using alcohol since then. Her physical condition has improved significantly. No mental health [treatment] or rehab. Stopped on her own. Not severe mental impairment.

(Tr. at 162.)

On September 6, 2001, plaintiff was seen by Dr. William Nimmer for a mental status review. (Tr. at 201–05.) Following an interview, Dr. Nimmer diagnosed panic disorder with elements of agoraphobia, an anxiety disorder, and major depressive disorder, with a GAF of 45.[9] (Tr. at 204.)

On October 18, 2001, plaintiff was seen by Dr. Roland Manos for another mental status examination. (Tr. at 206.) Dr. Manos's diagnoses were major depressive disorder, panic disorder without agoraphobia, and alcohol dependence in remission, with a GAF of 50. He concluded:

> Paula A. Windus appears to be able to understand, remember and carry out simple instructions. Her distress may mildly interfere with her ability to relate to supervisors and co-workers. She appears to have greater difficulty sustaining concentration due to her mood disorder and anxiety disorder. Work pace would appear to vary depending upon the patient's physical condition. The patient indicated that she feels overwhelmed by stress at this time. It is anticipated that she would not cope well with additional stressors including routine work stressors.

(Tr. at 212.)

On November 2, 2001, Dr. Matkom completed a psychiatric review technique form, evaluating plaintiff under Listings 12.04 (Affective Disorders), 12.06 (Anxiety–Related Disorders), and 12.09 (Substance Addiction Disorders). (Tr. at 231.) Under the B criteria applicable to those Listings, he found moderate restriction of activities of daily living; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence and pace; and no episodes of decompensation. (Tr. at 241.) He found no evidence of the presence of C criteria. (Tr. at 242.) Dr. Matkom also completed a mental RFC assessment, in which he wrote that plaintiff was not significantly

---

**9.** A GAF of 45 denotes serious symptoms or serious impairment in school, occupational or social functioning. *DSM–IV* at 34.

limited in 10 categories, moderately limited in 9, and markedly limited in one (ability to interact appropriately with the public). (Tr. at 227–28.) He concluded that plaintiff "should be able to perform unskilled, routine jobs that do not involve public contact." (Tr. at 229.)

### b. Physical Impairments

On November 1, 2001, Dr. Baumblatt completed a physical RFC assessment, in which he wrote that plaintiff could perform light work.[10] (Tr. at 219–26.) On March 2, 2002, Dr. Callear completed a physical RFC assessment, in which he also opined that plaintiff could perform light work. (Tr. at 261–62.)

### B. Hearing Testimony

At the hearing, plaintiff testified that she felt sad, useless, and at times like she did not want to live anymore. She stated that she cried every day. (Tr. at 362.) She also stated that she experienced panic attacks, during which her heart would race, she would sweat, have headaches and difficulty breathing, and experience nausea and a feeling of things closing in on her. She stated that she had two to three such attacks per week, usually lasting 20–30 minutes. (Tr. at 363.) She testified that going out of the house and being around people precipitated her spells. She stated that she had left the house alone just once in the previous 12 months, and on that occasion she got lost and confused and Chuck found her two blocks away. She stated that she was able to leave the house only if Chuck, her mother or her sister accompanied her. (Tr. at 364.)

Plaintiff testified that she had good and bad days with her hepatitis. She stated that two to three times per week she would experience an extended stomach, headaches, leg swelling, back pain, diarrhea and vomiting. (Tr. at 363, 370.) She testified that she was taking the medication metronidazole for her liver disease. (Tr. at 369.) Her insurance would not cover interferon treatment. (Tr. at 369, 376.)

Plaintiff testified that she had a problem with drugs and alcohol in the past. She used to drink beer every day, but last had a drink in August 2000, just before she was hospitalized with liver disease. (Tr. at 367.) She stated that she had a non-alcoholic beer on her birthday, March 24, but her doctor advised her not to do that again. (Tr. at 368.)

Regarding daily activities, plaintiff testified that Chuck did the grocery shopping. She stated that the last time she tried to shop with her mother she had a panic attack and had to leave the store immediately. (Tr. at 370.) She stated that she did not drive due to lack of concentration. (Tr. at 370–71.) On a bad day, she just stayed in bed. On a good day, she might vacuum, wash dishes or do a load of laundry. (Tr. at 371.) She stated that she used to garden, ride her bike, and bake but no longer had any hobbies. (Tr. at 365.) She testified that she stopped working because she was becoming irritable with the customers, was having problems with her drinking, and "just got fed up." (Tr. at 377–78.)

Plaintiff's mother Vivian testified that she saw her daughter two or three times

---

**10.** "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

per week, and that they spoke on the phone almost every day. (Tr. at 380.) She stated that she would take plaintiff out for lunch or a walk, and to doctor's appointments. Vivian testified that the last few times she took plaintiff out plaintiff experienced panic attacks and had to leave. (Tr. at 380–81.) Vivian also stated that plaintiff's ability to keep her mind on things was poor. (Tr. at 382.)

Donald Feinsilver, a psychiatrist, testified as a medical expert ("ME") at plaintiff's hearing. Dr. Feinsilver stated that he had reviewed the documentary evidence and heard the testimony. Regarding the Listings, he found the presence of A criteria under Listing 12.09, Substance Abuse Disorders, and 12.06, Anxiety–Related Disorders. He opined that while plaintiff may have a low grade depression under Listing 12.04, Affective Disorders, it was a distant third to alcoholism and anxiety. (Tr. at 388–89.) Regarding the "B" criteria, Dr. Feinsilver found mild to moderate restriction of activities of daily living (Tr. at 389–90), moderate impairment in social functioning (Tr. at 390), and mild to moderate difficulty in maintaining concentration, persistence and pace (Tr. at 390–91). Dr. Feinsilver stated that he could not speak to decompensation based on the information he had. (Tr. at 391.) He opined that plaintiff had a fair ability to relate to coworkers, a fair to good ability to relate to supervisors, a good to fair ability to deal with changes in a routine work setting, fair to poor ability to interact appropriately with the public, good judgment in the work place, fair to good ability to maintain concentration and attention, good to excellent ability to carry out simple instructions, and fair ability to carry out complex instructions. (Tr. at 391–93.)

The VE, Jackie Wenkman, classified plaintiff's past work as a waitress as light, unskilled work, and her work as a bartender as light, semi-skilled work. (Tr. at 394.)

The ALJ then posed several hypothetical questions. The first assumed a person of plaintiff's age, education and work experience, who was limited to light work that was simple, routine and low stress in nature, that would not involve dealing with the public and minimal interaction with coworkers and supervisors. (Tr. at 394–95.) The VE stated that such a person could perform light manufacturing work: assembly (28,000 positions in Wisconsin), inspection (7800 positions) and packaging (7500). If the exertional level was reduced to sedentary, the number of assembly jobs would be reduced to 6000 and the inspecting and packaging jobs to 1050. (Tr. at 395.) If the person could only occasionally twist or bend, the answer was the same. (Tr. at 395.) If the person could sit for no more than two hours or stand no more than 30 minutes continuously, the number of sedentary jobs would not change, but the number of light jobs would be reduced: half of the assembly and inspecting, and two-thirds of the packaging jobs would be eliminated. (Tr. at 395–96.) If the person had to take more than 10 unscheduled breaks during the day, the jobs would be eliminated. (Tr. at 397.) If the limitations expressed in plaintiff's testimony were accepted, no work would be available. (Tr. at 397–98.) If Dr. Bergarino's and Chrostowski's findings that plaintiff would frequently experience interference with attention and concentration were accepted, no work would be possible. (Tr. at 398.) Likewise, if the person could not perform routine tasks at a consistent pace no work would be possible. (Tr. at 398.) If Dr. Manos's opinion that plaintiff could not cope with regular work stress was accepted, there would be no work. (Tr. at 399.) Likewise, if Dr. Matkom's limitations were accepted, employment could not be maintained. (Tr. at 399–400.)

## C. ALJ's Decision

On December 19, 2003, the ALJ issued a decision denying plaintiff's claim. (Tr. at 16–25.) The ALJ concluded that plaintiff suffered from severe impairments—Hepatitis C, chronic liver disease, cirrhosis and affective disorder—but that none met or equaled any listed impairment. (Tr. at 17.) He then concluded that plaintiff possessed the RFC to perform light, simple, repetitive, low stress work with minimal contact with co-workers and supervisors, an inability to perform tasks with strict deadlines, occasional twisting, stooping or bending, and avoiding public contact. (Tr. at 23.) In so finding, the ALJ relied on the opinion of ME Feinsilver regarding plaintiff's mental abilities (Tr. at 21–22) and the state agency consultants regarding her physical abilities (Tr. at 23). He rejected the opinions of Drs. Burgarino and Chrostowski and plaintiff's testimony of disabling symptoms as inconsistent with the record. (Tr. at 22–23.) Based on this RFC and relying on the VE's testimony, the ALJ concluded that plaintiff could not perform her past work but could perform a significant number of other jobs. (Tr. at 23–24.)

## D. Appeals Council Review and District Court Action

Plaintiff requested review by the Appeals Council and provided additional records from Dr. San Augustin and Lynn Bellefeuil, MSW (Tr. at 342–55), but the Council denied plaintiff's request. (Tr. at 5.) This action followed.

Meanwhile, plaintiff had filed another application on April 29, 2004, which the Administration granted on July 21, 2004. Therefore, the application before me is now limited to a closed period of September 13, 2000 to April 29, 2004.

## III. DISCUSSION

### A. Evaluation of Medical Source Opinions

Plaintiff argues that the ALJ erred by rejecting the opinions of the treating physicians and ignoring the opinions of several consulting physicians.

#### 1. Standard

Under the Commissioner's Rulings and Regulations, the ALJ evaluates medical opinions differently depending on the source. Opinions from the claimant's treating physician (a/k/a "treating source" [11]) are entitled to "special consideration." *Lechner,* 321 F.Supp.2d at 1031 (citing *Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001)). If the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence, the ALJ must afford it "controlling weight." 20 C.F.R. § 404.1527(d)(2). Even if the ALJ finds that the treating source opinion is not entitled to controlling weight, he may not simply reject it. SSR 96–2p. Rather, he must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20

---

**11.** "Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." 20 C.F.R. 404.1502.

C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, he must always "'give good reasons'" for his decision. *Wates*, 274 F.Supp.2d at 1034 (quoting 20 C.F.R. § 404.1527(d)(2)).

If a medical provider who personally evaluated the claimant does not qualify as a treating source, whose report may receive controlling weight, s/he will nevertheless be considered an "examining source," whose opinion is generally entitled to more weight than that of a provider who did not examine the claimant. *Lechner*, 321 F.Supp.2d at 1031 (citing 20 C.F.R. § 416.927(d)(1)); *see also Criner v. Barnhart*, 208 F.Supp.2d 937, 953 (N.D.Ill. 2002) (citing *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir.1982); *Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977)). Finally, the reports of non-examining or consultative sources must also be considered, 20 C.F.R. § 416.927(f), although such opinions do not, by themselves, constitute substantial evidence sufficient to justify the rejection of a treating physician's opinion, *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003).

### 2. Application of Standard

#### a. Opinions Regarding Plaintiff's Mental Impairments

Regarding plaintiff's mental impairments, the ALJ credited the opinion of ME Feinsilver (Tr. at 19) and concluded that the opinions of treating sources Burgarino and Chrostowski were entitled to no weight (Tr. at 22). The ALJ mentioned part of Dr. Nimmer's report in the body of his decision (Tr. at 18, ¶5) but did not

specifically evaluate it; he did not discuss the opinions of Drs. Manos [12] and Matkom at all. Plaintiff argues that the ALJ erred (i) in rejecting the treating source opinions and (ii) in ignoring the opinions of the consulting physicians.

#### i. Treating Sources

The ALJ first stated that Dr. Feinsilver's opinion was entitled to greater weight than those of Drs. Burgarino and Chrostowski because Feinsilver had reviewed all of the medical evidence and was present at the hearing. (Tr. at 21–22.) Second, the ALJ stated that "Dr. Burgarino has established a pattern of routinely opining that his patients have extreme limitations when they are applying for Social Security disability." (Tr. at 22.) Third, the ALJ stated that in this case Dr. Burgarino found plaintiff totally disabled after just two appointments, saw her just a few times thereafter, and thus lacked a longitudinal treating relationship with plaintiff. (Tr. at 22.) Finally, the ALJ concluded that Dr. Burgarino's treatment notes did not support the extreme limitations found in his report, and that his opinion was not consistent with the evidence as a whole. (Tr. at 22.)

While the ALJ's statement about what Dr. Burgarino "routinely" does in other cases is problematic, *see Simmons v. Barnhart*, No. 02–1539–KAJ, 2004 WL 2323776, at *4, 2004 U.S. Dist. LEXIS 20588, at *11 (D.Del. Oct. 12, 2004) (quoting *Burkhart v. Bowen*, 856 F.2d 1335, 1341 (9th Cir.1988)) (stating that "an ALJ cannot rely on evidence outside the record in making a disability determination if doing so would effectively deprive the claimant of her opportunity to 'cross-examine a witness or rebut testimony'"), overall I cannot conclude that he erred in evaluating this opinion. The weighing of medical

12. The ALJ cited the exhibit number for Dr. Manos's report in discussing plaintiff's activi-

ties of daily living (Tr. at 21, ¶2), but he did not otherwise discuss the report.

opinions in a particular case is a task for the ALJ, so long as his final decision is adequately explained and supported by substantial evidence. *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir.1985). As the Seventh Circuit explained in *Books v. Chater,* 91 F.3d 972, 979 (7th Cir.1996):

> When evaluating a conflict between the opinions of treating and consulting physicians, we have held that "the ALJ must take into account the treating physician's ability to observe the claimant over a longer period." *Stephens v. Heckler,* 766 F.2d 284 (7th Cir.1985). However, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Reynolds v. Bowen,* 844 F.2d 451 (7th Cir. 1988). We have noted:
>
> > The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise.
>
> *Stephens,* 766 F.2d at 289. Thus, in the end, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—

subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Micus v. Bowen,* 979 F.2d 602, 608 (7th Cir.1992).

■■ The ALJ's finding in the present case was sufficient under this standard. Contrary to plaintiff's suggestion, the ALJ did not rely solely on Dr. Feinsilver's opinion in rejecting the treating source. *Cf. Gudgel,* 345 F.3d at 470. Rather, he compared Dr. Burgarino's opinion to the other evidence in the record and considered the factors set forth in § 404.1527(d). It is proper for the ALJ to consider whether the treating source's opinion is supported by the objective medical evidence, including his own treatment notes. *See Dixon v. Massanari,* 270 F.3d 1171, 1178 (7th Cir. 2001) (affirming rejection of opinion because objective evidence did not support it). It was also proper for the ALJ to consider the fact that Dr. Burgarino found plaintiff disabled after just two examinations, and that he did not see her frequently thereafter. *See* 20 C.F.R. § 404.1527(d)(2) (stating that frequency, nature and extent of treatment relationship is factor to consider in evaluating medical opinion); *see Stephens,* 766 F.2d at 289 (stating that "the treating physician may too quickly find disability"). Finally, it was proper for the ALJ to note that the extreme limitations Dr. Burgarino imposed [13] were inconsistent with the other evidence of record.[14] For example, the

---

**13.** Dr. Burgarino checked the box representing the most severe impairment/restriction for all of the B criteria (Tr. at 282) and all of the work activities on the RFC report (Tr. at 284).

**14.** The ALJ wrote that Dr. Burgarino's opinion was "not consistent with the evidence of record as a whole." (Tr. at 22.) The ALJ must give controlling weight to the treating source's opinion if it is "not inconsistent" with other substantial evidence in the record; the opinion need not be "consistent" with the record. *Dominguese,* 172 F.Supp.2d at 1100. However, under the circumstances, this was

not reversible error. The ALJ also found that Dr. Burgarino's opinion was not well-supported by his own treatment notes and thus was not entitled to controlling weight for that reason. *See* 20 C.F.R. § 404.1527(d)(2) (stating that treating source opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques *and* "not inconsistent" with other substantial evidence). Once the ALJ has decided not to give the report controlling weight, he must consider the opinion's consistency with the record as a whole. 20 C.F.R. § 404.1527(d).

ALJ noted that Dr. Burgarino found plaintiff "stable" on a mental status exam conducted on January 24, 2002. (Tr. at 22; 329.) Further, Dr. Burgarino's April 18, 2002 treatment note (the same date he prepared the checkbox report) does not support the assessment contained in the report.[15] (Tr. at 329.)

The ALJ additionally rejected Dr. Chrostowski's report because he simply agreed with his colleague Dr. Burgarino's views. The ALJ also stated that Dr. Chrostowski's treatment notes did not support these extreme limitations. (Tr. at 22.) For similar reasons, I cannot conclude that this was error. Dr. Chrostowski did not elaborate on his conclusions; he simply checked "yes" on the pre-printed form. See Dixon, 270 F.3d at 1177 (affirming rejection of opinion expressed by writing "yes" next to a question that the claimant's attorney had pre-typed). Further, Dr. Chrostowski's treatment notes, while they reflect ups and downs in plaintiff's condition, provide substantial evidence for the ALJ's conclusion, and it is not for the court to re-weigh this evidence. For example, on July 17, 2001, plaintiff reported feeling better and that she had a job interview that week. (Tr. at 331.) On May 29, 2002, she reported that she had been getting out more and had not experienced any panic attacks. (Tr. at 328.) On June 10, 2002, she again reported "feeling better." (Tr. at 327.) She was observed to be "more stable" on June 18, 2002 following a tearful phone call the previous day. (Tr. at 327.)

Therefore, I cannot conclude that the ALJ committed reversible error in evaluating the opinions of these treating sources. However, the ALJ's failure to evaluate several consulting physician opinions cannot be sustained.

### ii. Consulting Sources

As noted, the ALJ "must consider" the opinions of medical or psychological consultants. 20 C.F.R. 416.927(f)(2); see also SSR 96–7p (stating that ALJs "are required to consider findings of fact by state agency psychologists" and "must explain the weight given to the opinions in their decision"). He failed to do so here. Further, in light of the VE's testimony, this omission cannot be considered harmless error. See Keys v. Barnhart, 347 F.3d 990, 994–95 (7th Cir.2003) (applying harmless error review to ALJ's determination).

Dr. Manos, an examining consultant, opined that plaintiff would have "greater difficulty sustaining concentration due to her mood disorder and anxiety disorder," that her "[w]ork pace would appear to vary depending upon [her] physical condition," that "she feels overwhelmed by stress at this time," and "that she would not cope well with additional stressors including routine work stressors." (Tr. at 212.) The VE testified that if this opinion were accepted "then you would not be able to do even unskilled work." (Tr. at 399.)

Dr. Matkom opined that plaintiff was "moderately limited" in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable

---

**15.** I recognize that it is ordinarily improper for the lay ALJ to interpret bare medical findings in the treatment records. However, it is not improper for an ALJ to simply compare the recitation of symptoms and restrictions found in treatment records with a doctor's report. Cf. Mason v. Barnhart, 325 F.Supp.2d 885, 901 (E.D.Wis.2004) (recognizing that ALJ can weigh conflicting evidence in medical records, but reversing because ALJ interpreted treatment notes without analyzing later report from treating source).

number and length of rest periods; get along with co-workers and peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in a work setting; and travel in unfamiliar places or use public transportation. (Tr. at 227–28.) He opined that she was "markedly limited" in her ability to interact appropriately with the general public. (Tr. at 228.) The VE testified that if these limitations were accepted, the person could not maintain employment.[16] (Tr. at 400.)

Finally, Dr. Nimmer opined that plaintiff's GAF was 45 (Tr. at 204), which denotes "serious symptoms" or "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM–IV* at 34. The ALJ mentioned Dr. Nimmer's diagnoses but not his assessment of plaintiff's functioning, and the ALJ did not consider the weight, if any, his report deserved.[17]

It is well-established that an ALJ may not simply ignore evidence that is contrary to his conclusion. *See, e.g., Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir.2003) (stating that while the ALJ need not discuss every piece of evidence in the record, he may not ignore evidence that is contrary to his ruling);

*Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003) (stating that when important evidence is unmentioned by the ALJ, the court is left to wonder whether it was even considered); *Zurawski,* 245 F.3d at 888 (stating that it is incumbent upon an ALJ to discuss evidence contrary to the Commissioner's position); *Godbey v. Apfel,* 238 F.3d 803, 808 (7th Cir.2000) ("While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."). This is particularly true where, as here, the record shows that acceptance of such evidence would lead to a finding of disability. *See Elbert v. Barnhart,* 335 F.Supp.2d 892, 913–14 (E.D.Wis. 2004) (remanding where VE testified that if evidence ALJ rejected without adequate explanation were accepted claimant would be disabled). Therefore, the ALJ's decision must be reversed and the matter remanded for consideration of the opinions of Drs. Manos, Matkom and Nimmer.

### b. Opinions Regarding Plaintiff's Physical Impairments

Regarding plaintiff's physical limitations, the ALJ adopted the opinions of the state agency reviewers (Tr. at 23)[18] and rejected the portion of Dr. Saeian's report in which he opined that plaintiff

16. The Commissioner points to Dr. Matkom's conclusion that plaintiff could perform "unskilled routine jobs that do not involve public contact." (Tr. at 229.) However, the ALJ did not rely on this portion of the report to reject the specific findings outlined above, so I cannot accept the Commissioner's post hoc argument that Matkom supported the ALJ's conclusion. *See Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir.2002) (stating that "the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion"). Further, the question of whether plaintiff can perform unskilled work is not simply a medical question for a doctor; rather, it is a legal conclusion to be reached

by the ALJ after considering all of the evidence and with the assistance of a VE. *See Dixon,* 270 F.3d at 1177 (stating that the Commissioner, not a doctor, decides whether a claimant is disabled).

17. The VE was not asked about Dr. Nimmer's report.

18. The ALJ cited exhibits 2F and 10F in support of this finding. Exhibit 10F was Dr. Baumblatt's RFC assessment. However, exhibit 2F consisted of records from Froedert. The other state agency RFC report (Dr. Callear's) was marked exhibit 14F. The ALJ's reference to exhibit 2F was likely a typo.

would need to take 10 unscheduled breaks during a workday (Tr. at 21). The ALJ wrote:

> In July 2002, treating physician Kia Saeian, M.D. stated that the "bulk of the [claimant's] problems are related to underlying anxiety and depression. She complains of numerous constitutional symptoms which fit no specific pattern. Her cirrhosis is well compensated . . . ." (Exhibit 19F) This is tantamount to saying that the symptoms complained of cannot reasonably be expected to result from the impairment that the claimant has. Dr. Saeian opined that, at most, the claimant's back pain was moderate. While Dr. Saeian stated that the claimant would need to take ten breaks in an eight hour workday due to pain and anxiety, this limitation is not supported by his own treatment records and the undersigned does not give any weight to this statement.

(Tr. at 21.)

Later, after finding that plaintiff could meet the exertional requirements of light work, the ALJ wrote:

> In reaching this conclusion, the undersigned has also considered the opinions of the State Agency medical consultants pursuant to Social Security Ruling 96–6p, who evaluated this issue at the initial and reconsideration levels of the administrative review process. In Exhibit 2F [sic], the State Agency medical consultants determined that the claimant could perform work at the light exertional level with no postural, manipulative, visual, communicative or environmental limitations. While the State Agency medical consultants did not have the opportunity to examine the claimant, the undersigned finds that their opinion is consistent with the evidence of record. As such, the undersigned concurs with the

State Agency determination in Exhibit 10F.

(Tr. at 23.)

Despite the deference due ALJs in their weighing of competing evidence, because the ALJ's rejection of Dr. Saeian's report was unreasoned and not supported by substantial evidence, I cannot sustain this determination. *See Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir.1998) ("[B]ecause his opinion fails to build a bridge from the evidence to the conclusion and is thus analytically inadequate—in a word, unreasoned—we cannot uphold his decision.").

First, the ALJ interpreted the doctor's statements that plaintiff's problems were primarily psychological and that her symptoms fit no specific pattern to mean that those symptoms could not reasonably be produced. This does not logically follow. A doctor's inability to explain a condition or to find a physical cause therefor does not mean that the condition does not exist. *See Carradine v. Barnhart*, 360 F.3d 751, 754–55 (7th Cir.2004); *see also Sarchet*, 78 F.3d at 307 ("The administrative law judge also misunderstood the medical term 'nonspecific' to mean unbelievable rather than not clearly related to a particular disease. Sarchet's puffy legs, for example, could have been the result of any one of several different conditions. That doesn't mean she doesn't have puffy legs.").

Second, the ALJ stated that plaintiff's back pain was, at most, moderate. The doctor was provided with three choices regarding the severity of plaintiff's pain— mild, moderate and severe. He checked moderate; he did not qualify that characterization. (Tr. at 287.) Further, the ALJ ignored the doctor's statement that plaintiff "frequently" experienced such pain, which "frequently" interfered with the attention and concentration needed to perform even simple work tasks. (Tr. at 288.) The VE testified that with this limitation a

person could not maintain employment. (Tr. at 398.) The ALJ's failure to consider this limitation was error. *See Godbey*, 238 F.3d 803, 808 (7th Cir.2000) (reversing where ALJ selectively discussed doctor's report and did not address portions of that report which supported plaintiff's claim).

Third, the ALJ stated that Dr. Saeian's finding that plaintiff would need 10 unscheduled breaks per day due to pain and anxiety was not supported by his own treatment records. But the record contained no treatment records from Dr. Saeian. So far as the record shows, Dr. Saeian prepared this report with Mr. Knox after plaintiff had been seen once by Knox. (*See* Tr. at 287, 311–12.) Dr. Saeian's lack of a longitudinal treating relationship with plaintiff *could* have caused the ALJ to question Saeian's conclusions (and even his status as a "treating source," *see* 20 C.F.R. § 404.1502), but the ALJ did not say that, and "principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ." *Steele*, 290 F.3d at 941. As the record stands, there was no substantial evidence supporting the ALJ's statement.

This leaves the ALJ's reliance on the non-examining state agency physicians. As the Seventh Circuit has held: "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470. Therefore, the matter must be remanded for re-evaluation of Dr. Saeian's report.[19]

## B. Evaluation of Plaintiff's Credibility

Plaintiff also alleges that the ALJ erred in evaluating her credibility.

### 1. Standard

Generally, the court must defer to the ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing. Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994). Further, the court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence. *See Sarchet*, 78 F.3d at 307–08. Finally, the ALJ must comply with SSR 96–7p in evaluating

19. Earlier in his decision, the ALJ stated that plaintiff's ascites had resolved, her liver was hardly palpable, and her albumin and bilirubin levels were normal. (Tr. at 20.) To the extent that the ALJ relied upon this supposed improvement in plaintiff's condition to support his rejection of Dr. Saeian's report, his decision also cannot stand. The ALJ is not qualified to interpret the significance of these laboratory results. *See Worzalla*, 311 F.Supp.2d at 796 (citing *Manso–Pizarro v. Sec'y of Health & Human Services*, 76 F.3d 15, 17 (1st Cir.1996) (stating that "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record"); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence."); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir.1982) ("Because an Administrative Law Judge as a rule is not a doctor, he should avoid commenting on the meaning of a test or clinical x-ray when there has been no supporting expert testimony."); *Grindle v. Sullivan*, 774 F.Supp. 1501, 1513 (N.D.Ill.1991) (stating that ALJ "was not in a position to interpret the results of the Doppler test on his own")).

credibility. *Lopez v. Barnhart,* 336 F.3d 535, 539–40 (7th Cir.2003); *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003).

SSR 96–7p provides, in pertinent part:

In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96–7p.

Under SSR 96–7p, the relevant considerations include:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

While SSR 96–7p does not require the ALJ to analyze and elaborate on each of the seven factors set forth when making a credibility determination, the ALJ must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. *Lechner,* 321 F.Supp.2d at 1030. Finally, SSR 96–7p provides that ALJ's decision must include "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

**2. Application of Standard**

■ The ALJ found that plaintiff's testimony of disabling symptoms was not fully consistent with the evidence of record. (Tr. at 23.) The only specific reason he provided was that her "ability to engage in essentially full and effective activities of daily living negatively impact[s] on her allegation of daily, chronic symptoms . . . ." (Tr. at 21.) The Commissioner argues that, interspersed throughout the ALJ's decision, were other reasons for doubting the credibility of plaintiff's allegations. However, I cannot infer a credibility determination from a general discussion of the evidence, or accept the "theory that the body of the ALJ's decision implicitly supplies reasons for rejecting the [claimant's] testimony." *Golembiewski,* 322 F.3d at 916.

"Where an ALJ only expresses the claimant's ability to perform day-to-day activities in support of his finding that the claimant is not credible, courts have been hesitant to find that substantial evidence supported the ALJ's decision." *Luna v.*

*Massanari,* No. IP 00–1075–C–T/G, 2001 WL 987860, at *4, 2001 U.S. Dist. LEXIS 13117, at *13 (S.D.Ind. July 18, 2001). Moreover, in the present case the "ALJ's list of activities was either unsupported by the record, or consisted of the sort of minimal daily activities that are consistent with inability to work full-time." *See Elbert,* 335 F.Supp.2d at 910; *see also Mason v. Barnhart,* 325 F.Supp.2d 885, 903 (E.D.Wis.2004) ("The ALJ's list of plaintiff's daily activities also provides insufficient support for his conclusion. Some of the listed activities are not inconsistent with an inability to work, while others have little or no support in the record."). Finally, the ALJ made no effort to build a bridge from the list to his conclusion.

The ALJ stated that plaintiff "performs her own self-care, lives with a long time live-in boyfriend, cleans house, washes dishes, cooks, rides the bus, visits with family and friends, cares for her cat, attends medical appointments, sits on the porch, talks on the phone, goes to the library, takes walks, occasionally dines out in the community, shops, watches TV, likes to garden as a hobby, goes to the park and talks to neighbors (Exhibits 4E, 7F, 8F)." (Tr. at 21, ¶ 2.) I address each activity in turn:

- **Plaintiff performs her own self-care.** "The ability to care for one's self is not inconsistent with a finding of disability." *Mason,* 325 F.Supp.2d at 903 (citing *Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y.2000)).

- **Plaintiff lives with a long time live-in boyfriend.** It is unclear how this negatively affects plaintiff's credibility. One need not live in complete isolation to gain entitlement to disability benefits. *Id.* at 904 (citing *Carradine,* 360 F.3d at 756).

- **Plaintiff cleans house, washes dishes and cooks.** In exhibit 4E, plaintiff wrote that she did "some

cooking"-TV dinners and other frozen meals, soups and sandwiches. (Tr. at 96.) In exhibit 7F, Dr. Nimmer recorded that plaintiff did "simple housework," that her "significant other will do the dishes and 'it depends on the day' just how much get up and go she has to take care of her own ADLs or minor domestic chores." (Tr. at 204.) In exhibit 8F, Dr. Manos reported that when she felt well plaintiff would try to wash dishes or vacuum but when her legs swelled she had to sit in a recliner, and that she did "little cooking." These minimal activities are not inconsistent with plaintiff's claims of disabling symptoms. *See Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000) (holding that plaintiff's ability to cook simple meals and perform minimal household chores, with help from her husband, did not undermine her credibility).

- **Plaintiff rides the bus.** "The ability to use public transportation is a factor the ALJ considers in evaluating an alleged mental impairment." *Elbert,* 335 F.Supp.2d at 910–11. In exhibit 4E, in response to the question, when you go out, do you walk, ride the bus or drive, plaintiff checked "walk" and "ride the bus." (Tr. at 96.) However, in the same series of questions plaintiff wrote that she only went out when someone was with her. The significance of the ability to use public transportation lies in the ability to navigate the system, understand the routes, etc., *alone,* not with a chaperone. Further, Dr. Matkom opined that plaintiff was "moderately limited" in her ability to use public transportation, a finding the ALJ ignored.

- **Plaintiff visits with family and friends.** In exhibit 4E, plaintiff wrote that she got together with family or friends only two or three times per

month. (Tr. at 97.) In exhibit 7F, Dr. Nimmer reported that plaintiff

does have some support from a brother, her sister, her significant other, and mother. She does have an old acquaintance that may call her, but on a whole, there is only one friend that she might see now, who will stop by once a week or so to visit. On rare occasions, they might go out together. Otherwise, she is simply quiet at home.

(Tr. at 204.) In exhibit 8F, Dr. Manos reported that plaintiff "is usually at home. She does not go out alone." (Tr. at 211.) Thus, the evidence did not support the ALJ's assertion that plaintiff's social functioning was "essentially full and effective." "In any event, one can be disabled and yet get together with family or friends from time to time." *Elbert,* 335 F.Supp.2d at 910; *Mason,* 325 F.Supp.2d at 904.

- **Plaintiff cares for her cat.** It is difficult to understand how the ability to feed a cat is inconsistent with a claim of disabling symptoms.

- **Plaintiff attends medical appointments.** The evidence was that plaintiff did not attend these appointments alone; her mother usually took her. (Tr. at 211 [Ex. 8F], "Vivian Windus stated that she keeps track of Paula's appointments for her and takes her to the appointments.") "It is also difficult to see how the ability to make it to a doctor's appointment undermines a claim of disability." *Elbert,* 335 F.Supp.2d at 910.

- **Plaintiff sits on the porch and talks on the phone**. Again, how these activities are inconsistent with plaintiff's claims is a mystery.

- **Plaintiff goes to the library, takes walks and occasionally dines out in the community.** The evidence was consistent—plaintiff did these things only when someone accompanied her. (Tr. at 96, 204, 211.)

- **Plaintiff shops.** In Exhibit 4E, plaintiff wrote, "I don't" shop. (Tr. at 96.) In Exhibit 8F, Dr. Manos reported that plaintiff shopped only with Mr. Johnson. (Tr. at 210.) Moreover, this activity is not inconsistent with a claim of disability. *See Clifford,* 227 F.3d at 872 ("She stated that she goes grocery shopping about three times a month and 'sometimes' carries groceries from the car to the apartment.").

- **Plaintiff watches TV**. In exhibit 4E, plaintiff wrote that while she had the television on all day, "it's like watching a blank screen with noise." (Tr. at 97.) Once again though, it is unclear how this is inconsistent with an inability to engage in full-time work, and the ALJ did not explain. *See Mason,* 325 F.Supp.2d at 903.

- **Plaintiff likes to garden.** In both Exhibit 4E and 8F, plaintiff reported that she enjoyed gardening. However, in neither did she describe the frequency with which she gardened or how strenuous her gardening was. At the hearing, plaintiff testified that she used to garden but no longer did. (Tr. at 365.) Thus, this activity provided little support for the ALJ.

- **Plaintiff goes to the park and talks to neighbors.** In Exhibit 4E, plaintiff wrote that she talked to the neighbors "only when outside." (Tr. at 98.) I could not in the exhibits cited find any reference to trips to the park. Plaintiff did testify at the hearing that she might go to the park with her mother or sister. (Tr. at 365.) But again, this activity was limited by the requirement that plaintiff not go alone.

Thus, the only explicit reason provided by the ALJ for his assessment of plaintiff's credibility failed to support his conclusion.

After listing plaintiff's activities, the ALJ stated that plaintiff took only generic or over the counter medications for her symptoms. (Tr. at 21, ¶ 2.) While he did not explicitly say so, the inference was that plaintiff's condition could not be severe absent a more powerful medication. While the type and dosage of medication a claimant takes is a factor in evaluating the credibility of a claimant's complaints, 20 C.F.R. § 404.1529(c)(3)(iv); *see also* SSR 96–7p, the ALJ must still build a bridge from such evidence to his conclusion. In the present case, the ALJ failed to explain what sorts of medications someone with severe symptoms from end stage liver disease would be expected to take, nor would such be obvious to a lay person. Absent some support in the record, it was improper for the lay ALJ to draw conclusions about the severity plaintiff's symptoms from her use of medication. *See Yousif v. Chater,* 901 F.Supp. 1377, 1384 n. 6 (N.D.Ill.1995) ("Although Commissioner's regulations allow the type and dosage of medication to be considered, it is certainly problematic for the ALJ to observe that Yousif was not taking the type of medication 'usually prescribed' for the pain of which she was complaining."). The ALJ also failed to account for the fact that plaintiff was to begin interferon treatment, but her insurance would not cover the expense. *See* SSR 96–7p ("The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). Finally, the ALJ failed to consider plaintiff's testimony that she limited her activities due to her symptoms, particularly on "bad days." *See Kent v. Apfel,* 75 F.Supp.2d 1170, 1183–84 (D.Kan.1999) (rejecting ALJ's finding where "the claimant testified that he ... restricted his activities to handle the pain"). Therefore, even if I consider this statement regarding medication in conjunction with the ALJ's list of daily activities, his credibility determination cannot stand. *See Kelsey v. Bowen,* 681 F.Supp. 595, 602 (N.D.Ind.1988) ("Neither the evidence related to medication, nor the activities described by the plaintiff, constitute substantial support for the ALJ's inference.").

Moreover, even if it were appropriate to comb the decision for other reasons, the conclusion could not stand. The ALJ stated that plaintiff admitted consuming beer on her birthday in March but claimed that she had otherwise abstained since her liver disease was diagnosed in August 2000. (Tr. at 19–20.) The ALJ noted that an April 6, 2001 record from Dr. Affi stated that plaintiff continued to drink, and a June 4, 2001 record stated that plaintiff quit drinking "several months ago." (Tr. at 20.) The ALJ made this observation in the context of finding that plaintiff had a substance addiction disorder; he did not use it to cast doubt on her credibility. (Tr. at 20, ¶ 1.) But even if plaintiff may not have been completely honest regarding when she stopped drinking, given her long history of alcoholism it does not follow that she was lying about her symptoms. Finally, the ALJ failed to address plaintiff's testimony that the drink she consumed on her birthday was a non-alcoholic beer. (Tr. at 368.)

The ALJ also stated that plaintiff testified that she "continues to experience daily diarrhea, extreme fatigue, headaches, back pain, nausea, and vomiting due to Hepatitis/cirrhosis." (Tr. at 20, ¶ 3.) Nevertheless, the ALJ noted that Dr. Affi prescribed Interferon for just one month in July 2001, plaintiff failed to return to Dr. Affi's office until December 6, 2001, and at

that time she reported only occasional nausea and some right upper quadrant pain. The ALJ also noted that subsequent blood tests showed that plaintiff's albumin and bilirubin levels were normal. (Tr. at 20, ¶ 3.) There are several problems with these observations. First of all, plaintiff did not testify that she experienced *daily* symptoms related to her Hepatitis. Rather, she said that two to three times per week she would experience an extended stomach, headaches, leg swelling, back pain, diarrhea and vomiting. (Tr. at 363, 370.) This was consistent with her statement to Dr. Affi that she experienced symptoms "occasionally." Second, the ALJ offered no support for the inference that Dr. Affi's prescription for just one month of Interferon meant that plaintiff's condition was not severe. There is no evidence in the record as to how long someone with severe liver disease should follow this treatment regimen. Third, the ALJ failed to consider any reasons for plaintiff's failure to pursue consistent treatment with Dr. Affi. One clear reason appears in the record—she was unable to afford and her insurance refused to cover the treatment Dr. Affi had prescribed. Finally, as discussed above, the ALJ was not qualified to interpret the albumin and bilirubin levels in the lab tests. *See Worzalla,* 311 F.Supp.2d at 796 (collecting cases).

The ALJ further stated that there was no evidence that plaintiff sought medical treatment for her symptoms. For example, he claimed that when plaintiff saw Dr. Affi on April 6, 2001, she "denied any symptoms of abdominal/chest pain, nausea or vomiting." (Tr. at 21, ¶ 1.) The ALJ was wrong. Plaintiff told Dr. Affi that she had nausea on April 6, 2001. (Tr. at 169.) She likewise reported nausea on December 6, 2001. (Tr. at 293.) The ALJ also failed to mention the treatment plaintiff received from the Sethi Medical Clinic for symptoms related to liver disease, including weakness and fatigue, which included various medications and vitamins. (Tr. at 249–60.) Further, on the very next page of his decision the ALJ stated that plaintiff took prescription metronidazole for gastric upset,[20] as well as over the counter pain medication and Mylanta for heartburn. (Tr. at 21, ¶ 2.)

Finally, the ALJ made several observations about plaintiff's mental impairments. For instance, he stated that plaintiff told Dr. Nimmer that she likes to have someone accompany her outside "for a feeling of safety" rather than true agoraphobia. (Tr. at 21, ¶ 3.) Dr. Nimmer's diagnosis was "panic disorder with elements of agoraphobia." (Tr. at 204.) He did not discount plaintiff's statement that she could not go out alone. The ALJ also stated that plaintiff's anxiety was related in part to her health status; flare-ups of Hepatitis would increase her anxiety. (Tr. at 21, ¶ 3.) There was support for this observation in the record (Tr. at 189), but that does not mean that her anxiety did not exist. *Cf. Carradine,* 360 F.3d at 754–55. Finally, the ALJ stated that plaintiff was

---

**20.** The ALJ stated that metronidazole is "a generic medication for gastric upset." (Tr. at 21, ¶ 2.) The basis for this statement is unclear. According to *Stedman's Medical Dictionary* 1110 (27th ed.2000), this medication is "[a]n orally effective trichomonocide used in the treatment of infections caused by *Trichomonas vaginalis* and *Entamoeba histolytica* and Gram-negative anaerobic bacteria. Can produce a disulfiram reaction when combined with alcohol." Disulfiram is "[a]n antioxidant that interferes with the normal metabolic degradation of alcohol in the body, resulting in increased acetaldehyde concentrations in blood and tissues. Used in the treatment of chronic alcoholism; when small quantity of alcohol is consumed an unpleasant reaction results." *Id.* at 531. Thus, it appears that this medication may have been prescribed to ensure that plaintiff did not drink.

non-compliant with treatment, failing to attend a relapse prevention program and missing some psychotherapy appointments. (Tr. at 21, ¶ 3.) However, as the court held in *Shramek v. Apfel,* 226 F.3d 809, 812–13 (7th Cir.2000), reliance on such evidence to cast doubt on a claimant's credibility:

> is a misuse of the non-compliance regulation. 20 C.F.R. § 404.1530(a) provides that "in order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." The failure to do so without good reason will result in a denial of benefits. 20 C.F.R. § 404.1530(b). "Essential to a denial of benefits pursuant to Section 404.1530 is a finding that if the claimant followed her prescribed treatment she could return to work." *Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir.1985).

In *Rousey,* we reversed an ALJ's denial of benefits premised in part on the claimant's failure to quit smoking where the claimant suffered from chronic obstructive pulmonary disease. We held that no evidence demonstrated that she would be restored to a non-severe condition if she quit smoking. *Id.* We similarly denounced the ALJ's conclusion that her smoking rendered incredible her allegations of pain because no medical evidence linked her chest pain directly to her smoking. *Id.* at 1070. As in *Rousey,* the ALJ here made no finding that the prescribed treatment would restore her ability to work, and the record would not in fact support such a finding. In addition, no medical evidence directly linked her pain or swelling to her smoking. Therefore, the ALJ erred in relying on her failure to quit smoking as evidence of non-compliance and as a basis to find her incredible.

In the present case, the ALJ did not find and there was no evidence in the record to suggest that plaintiff's symptoms would have disappeared had she not missed a few therapy appointments or regularly attended relapse prevention. Nor would it be reasonable to assume that plaintiff's mental problems were not severe because she missed a few scattered appointments, usually due to (physical) illness. Therefore, this observation could not reasonably support the ALJ's credibility finding.

In sum, even if these additional observations could be used to bolster the ALJ's credibility determination, because they were either unsupported by the record or analytically flawed, I would be obliged to reverse.

## C. Remedy

Plaintiff argues that reversal and an award of benefits is the proper remedy. In the alternative, she asks that the matter be remanded for rehearing before a different ALJ.

▬ Ordinarily, when an ALJ errs, the appropriate remedy is to remand for further proceedings. Only if all essential factual issues have been resolved and the record overwhelmingly supports a finding of disability, *see, e.g., Faucher v. Sec'y of Health & Human Services,* 17 F.3d 171, 176 (6th Cir.1994); *Meinders v. Barnhart,* 195 F.Supp.2d 1136, 1145 (S.D.Iowa 2002), or the court finds that the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court, *e.g., Worzalla,* 311 F.Supp.2d at 800, should the court order benefits.

▬ In the present case, the proper remedy is remand. The record does not overwhelmingly support a finding of disability, and the primary reason for reversal is the ALJ's failure to properly consider certain evidence and testimony. Because it is the ALJ's job and not the

court's to weigh evidence, the Administration should be given the opportunity to pass on the evidence in the first instance. *See, e.g., Mason,* 325 F.Supp.2d at 908. "Further, this is plaintiff's first § 405(g) appeal, and there is no indication that the Commissioner has stubbornly refused to apply the law to plaintiff's claim." *Lechner,* 321 F.Supp.2d at 1037. Thus, the request for a judicial award of benefits is denied.

However, I will recommend on that on remand the Commissioner assign the matter to a different ALJ. While there is insufficient evidence of bias such that I could order review by another judge, the tone of the ALJ's decision in the present case "suggests that [ ]he may have an unshakable commitment to the denial of this applicant's claim." *Sarchet,* 78 F.3d at 309; *see also Alexander v. Barnhart,* 287 F.Supp.2d 944, 968 (E.D.Wis.2003); *Harris v. Barnhart,* 219 F.Supp.2d 966, 977 (E.D.Wis.2002) (citing *Gister v. Massanari,* 189 F.Supp.2d 930, 938 (E.D.Wis. 2001)).[21]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED,** and this matter is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), sentence four.

---

21. On remand, plaintiff may raise her concern about the ALJ's failure to include the inability to "perform tasks with strict deadlines" (Tr. at 23) in his hypothetical questions to the VE. Because low stress work generally does not require the ability to work at a high pace or with strict deadlines, *e.g., Mangold v. Chater,* No. 93–1320–FGT, 1995 WL 580099, at *6, 1995 U.S. Dist. LEXIS 14579, at *17 (D.Kan. Sept. 15, 1995), and there is no requirement that the ALJ's questions to the VE

employ the precise terms used in setting RFC, *Roe v. Chater,* 92 F.3d 672, 676 (8th Cir.1996), this omission may not have constituted reversible error. *But cf. Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir.2004). However, because it is unclear whether the VE in this case understood low stress work not to require strict deadlines, and because the matter must be remanded anyway, I will include this issue among those to be resolved by the Commissioner on remand.